FW 40000 6600

SEP 9 2026 AM9:13
FILED-USDC-NDTX-FW

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

ANTOINE JOSEPH HEDARY,

Plaintiff,

v.

CITY OF FORT WORTH, TEXAS;
W. CALLENDER, in his individual capacity;
C. MOORE, in his individual capacity;
M. MUSE, in his individual capacity;
A.S. WITT, in his individual capacity;
T.M. HOOKS, in his individual capacity;
M.D. CARTWRIGHT, in his individual capacity;
C.R. LEARY, in his individual capacity;
J.E. FORD, in his individual capacity; and
JOHN DOE 1 and JOHN DOE 2, in their individual capacities,

Defendants.

Civil Action No. 4:26-cv-__________

4-26CV1107-P

JURY TRIAL DEMANDED

**PLAINTIFF'S ORIGINAL COMPLAINT**
**42 U.S.C. § 1983**

## I. NATURE OF THE ACTION

1. On September 8, 2024, officers of the Fort Worth Police Department executed what their own report calls a "High Risk Stop" on Plaintiff Antoine Joseph Hedary — a felony stop, conducted with firearms pointed at the vehicle and its occupants — on the strength of a stolen-vehicle database status that existed for exactly one reason: four weeks earlier, Plaintiff had asked the Department to create it when he reported his own truck stolen. The Department's own theft

report named Plaintiff as "Victim 1" and as the owner of record. The Department never cleared the entry after the truck was back in Plaintiff's possession. No officer confirmed the hit before deploying force. The officers' own report admits that Plaintiff was placed in custody first, that confirmation came second, and that confirmation immediately disproved the hit. The Department's own one-line summary of the encounter reads: "On 09/08/24 Officers located what they believed to be a stolen vehicle but made a Narc arrest."

2. When the only stated justification for the stop dissipated, the officers did not release Plaintiff. They searched his vehicle on a "plain view" claim whose stated location appears in some versions of the officers' own account and is omitted from the version supporting Plaintiff's arrest and from the sworn probable-cause affidavit; they opened a closed opaque container; and they arrested him — recording his arrest sixteen minutes before the first TruNarc test that the arresting officer's sworn affidavit sequences as the basis for it. The prosecution that followed was dismissed.

3. The Department's account of why any of this happened begins not with an observation but with a notification from its Real Time Crime Center — a notification of which the City has produced no record at all, on an incident created with no caller, transferred one second after its creation to a system the City will not name, at a scene where four Department units were already standing.

4. This is an action under 42 U.S.C. § 1983 for damages against the officers who seized, searched, and arrested Plaintiff, against the Real Time Crime Center operators who originated the encounter, and against the City of Fort Worth, whose records practices produced it.

## II. JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

6. Venue lies in the Northern District of Texas, Fort Worth Division, under 28 U.S.C. § 1391(b)(2), because all of the events giving rise to these claims occurred in Fort Worth, Tarrant County, Texas.

## III. PARTIES

7. Plaintiff Antoine Joseph Hedary is an individual residing at 1821 NW 20th Street, Fort Worth, Texas 76164. He appears pro se.

8. Defendant City of Fort Worth, Texas ("the City") is a Texas home-rule municipality. It operates the Fort Worth Police Department ("FWPD" or "the Department"), including the Department's Real Time Crime Center ("RTCC"), its records desk that enters and clears entries in the Texas Crime Information Center and National Crime Information Center systems (referred to in Department records as "PIC"), and the intelligence function the City's own filings denominate "INTEX." The City may be served through its City Secretary.

9. Defendant W. Callender (Badge 4930) is an FWPD officer who, operating unit B222, initiated the felony stop of Plaintiff on September 8, 2024, authored FWPD Report 240071260, and swore the probable-cause affidavit on which Plaintiff was held. He is sued in his individual capacity.

10. Defendant C. Moore (Badge 4744) is an FWPD officer who, operating unit A114, was logged on scene at the incident location at the second the incident was created, before any stop existed, and who logged in the Department's dispatch record that a firearm was pointed and that the object later claimed as the basis for the search was observed. He is sued in his individual capacity.

11. Defendants M. Muse (Badge 4105, unit B223), A.S. Witt (Badge 4969, unit B214), T.M. Hooks (Badge 4872, unit A215), M.D. Cartwright (Badge 5057, unit A212), C.R. Leary (Badge 4711, unit A212), and J.E. Ford (Badge 4715, unit A216) are FWPD officers who responded to and participated in the seizure of Plaintiff on September 8, 2024. Their names and

badge numbers are taken from the Department's own personnel roster for the incident. Each is sued in his or her individual capacity.

12. Defendants John Doe 1 and John Doe 2 are the FWPD Real Time Crime Center operators who generated and transmitted the "Crime Center" notification that precipitated the stop. Their identities are recorded in RTCC operator and tasking logs and in the CAD records identified in Part V below, which are in the City's exclusive control. Each is sued in his or her individual capacity. Plaintiff will amend to name them upon identification.

## IV. FACTS

### A. Plaintiff reports his own truck stolen. The Department creates the stolen status and never clears it.

13. At all relevant times Plaintiff was the registered owner of a 2021 Chevrolet Silverado pickup, VIN 3GCPWCEK8MG439943, bearing Texas license plate PVJ2872. FWPD's own records identify him as the owner: Report 240063176 lists "Owner Name: Hedary Antoine JOSEPH, Owner DOB 11/26/1986," with Plaintiff's telephone number, 682-208-2234.

14. On August 11, 2024 at 6:12 p.m., Plaintiff called FWPD to report that truck stolen. The Department opened CAD incident 240775714 with the problem nature "Stolen Vehicle." The call-taker logged the caller as "ANTWON HEDERI" at Plaintiff's telephone number. The CAD comment at 6:16 p.m. records the vehicle, its VIN, where it was last seen, and: "NO HITS IN AUTO RETURN."

15. No unit was assigned to Plaintiff's stolen-vehicle call for five hours and thirty-one minutes. Officers A.M. Carriere-Tieman (Badge 4883) and C.R. Cook (Badge 4158), unit B326, were assigned at 11:43 p.m. and arrived at 11:59 p.m.

16. While Plaintiff waited for officers to take his theft report, the Department's Real Time Crime Center ran him. Between 8:54:17 p.m. and 8:58:19 p.m. the CAD logs entries by RTCC operator "RTCC25": "protection order on cp" followed by a full NCIC return on Plaintiff — the

complainant — including his date of birth, FBI number, state identification number, driver's license number, Social Security number, and Tarrant County identification number, and, within the protection-order record, "LIC/PVJ2872" and "VIN/3GCPWCEK8MG439943" with the notation "EXP/20240830"; the "last flock hit" on Plaintiff's plate, an automated license-plate-reader read of August 5, 2024 at 10:57:10 p.m. from camera #41, eastbound 1500 W. Biddison Street; and the note "there's a couple of caution advisory bolo's on cp." The TCIC record in that return carried Plaintiff's home address as 3027 8th Avenue.

17. FWPD Report 240063176, dated August 12, 2024, records the offense as "AUTO THEFT," Tex. Penal Code § 31.03(e)(4)(A), a state jail felony. It names "Victim 1: Hedary, Antoine JOSEPH" and "Suspect 1: UNKNOWN." Its vehicle block lists plate PVJ2872, VIN 3GCPWCEK8MG439943, and "Status: 7 STOLEN." The narrative records that Plaintiff "stated he did not know who had the truck and did not give anyone else permission to drive his vehicle," that Plaintiff "stated he had one key that was in his possession with no keys missing," and closes: "PIC NOTIFIED." The first officer's dashboard camera is recorded as "NOT ACTIVATED."

18. On the vehicle record of that same report, the fields "NCIC Entered," "NCIC Number," "Cleared NCIC By," "Date Cleared," "NCIC Clearance," "Vehicle Recovery," "Recovery Date," and "Released date" are all blank. The Department's own supplements to that report record what its face does not: a stolen-vehicle entry for plate PVJ2872 was made in the TCIC/NCIC system on August 12, 2024 at 2:46:52 a.m. (Report 240063176, Supplement 001; teletype MRI 46456837), and that entry was not cleared until September 8, 2024 at 3:54:47 p.m. (Report 240063176, Supplement 003). For twenty-seven days the Department maintained a felony stolen-vehicle status on Plaintiff's truck, left every clearance and recovery field of its own record empty, made no inquiry when the truck returned to its owner, and left the status active, unverified, and uncleared — notwithstanding that the vehicle was back in the possession of the man who had reported it stolen. The certified TCIC/NCIC entry-and-clearance audit for that entry has been requested from the City and has not been produced.

**B. September 8, 2024: an incident is created with no caller, and units are already in place.**

19. On September 8, 2024 at 3:42:44 p.m., FWPD CAD incident 240876561 was created (case 240071260). Its problem nature was "Investigation" — not "Stolen Vehicle." Its recorded address was 8th Avenue at West Berry Street. There is no caller on the incident; the Call Receipt block is blank.

20. One second later, at 3:42:45 p.m., the CAD activity log recorded: "Incident has been transferred, fusion ID C2C1." At 3:43:03 p.m. an address change was logged, and the incident's official address was moved to 6th Avenue at West Berry Street — a location at which none of the events described below occurred.

21. Unit A114 — Defendant Moore — was recorded as assigned, en route, and arrived at 3:42:44 p.m., the same second the incident was created, and was logged "On Scene" at 3:42:45 p.m. No dispatch preceded that assignment and no caller generated the incident. Units B222 (Defendant Callender), A212 (Defendants Cartwright and Leary), and A216 (Defendant Ford) were each logged "Responding From = 8TH\8TH AVE" when attached to the call between 3:47:44 and 3:48:45 p.m. — already positioned on 8th Avenue. The felony stop of Plaintiff was not announced until 3:48:33 p.m., five minutes and forty-eight seconds after unit A114 was on scene. No record produced by the City explains the presence of four units on 8th Avenue at a scene that did not yet exist.

22. According to Defendant Callender's own report, "Officers were notified by Crime Center that there was an occupied Stolen Vehicle With the Tx LP (PVJ2872) driving Southbound on 8th Ave. Due to this Officers started to saturate the area trying to find the vehicle." The "Crime Center" is the Department's Real Time Crime Center. The underlying detection record — the license-plate read, hotlist hit, or other source of that notification, its timestamp, and the verbatim text transmitted to field units — has been requested from the City under the Texas Public Information Act and has never been produced.

23. The CAD records the escalation in real time: at 3:48:00 p.m., "B222 sb 8th ave .."; at 3:48:09 p.m., "B222 occupied 60"; at 3:48:33 p.m., "B222 2900 8th ave felony stop facing eb"; and at 3:50:39 p.m., "A216 x2 in custody."

**C. The felony stop.**

24. At approximately 3:47 to 3:48 p.m., in the 2900 block of 8th Avenue, Fort Worth — one block from the address the City's own TCIC record carried as Plaintiff's home, 3027 8th Avenue — Defendant Callender initiated what his report describes as a "High Risk Stop" of the vehicle Plaintiff was driving. Plaintiff's passenger was Elissa Marie Aragon. A "high risk" or felony stop is the Department's procedure for stopping a vehicle believed to be occupied by a dangerous felon: officers take positions of cover, draw and point their firearms, and order the occupants out and to the ground or to their knees by loudspeaker command. That is what happened here, and the Department's own dispatch record says so: unit A114 (Defendant Moore) logged "FIREARM POINTED," and unit B223 (Defendant Muse) logged "pointed firearm at vehicle and occupants." Plaintiff and his passenger were ordered out at gunpoint and placed in custody; the CAD records both in custody at 3:50:39 p.m. Plaintiff remained in custody at the scene from that moment until his arrest was recorded at 5:06 p.m., one hour and fifteen minutes later.

25. Units converged as follows: A114 (Moore) on scene at 3:42:45 p.m.; B222 (Callender) at 3:47:44 p.m.; A212 (Cartwright and Leary) at 3:48:44 p.m.; A216 (Ford) at 3:48:44 p.m.; B223 (Muse) at 3:49:01 p.m.; B214 (Witt) at 3:49:20 p.m.; and A215 (Hooks) at 4:07:50 p.m.

26. Plaintiff and his passenger complied with every command. Neither made any furtive movement, attempted to flee, or resisted in any way. Defendant Callender's report confirms it: "All occupants of the vehicle complied with commands from myself and other officers."

27. No officer, before initiating the felony stop or before taking Plaintiff into custody, contacted the Department's own records desk to confirm that the stolen-vehicle status was accurate and current — a confirmation that, under the operating rules governing the TCIC/NCIC system on which every officer relied, is required before a hit may be acted upon, because a hit alone is not probable cause to arrest. Here the entering agency and the inquiring agency were the same department, and the record that confirmation would have retrieved was the Department's own Report 240063176, which identified the man they had guns trained on as the complainant who reported the theft, the "Victim 1" of record, and the registered owner of the truck. The Department's own system said the same thing in real time: at 3:51:37 p.m. — one minute after custody — the title return in unit A114's CAD record read "OWNER ANTOINE JOSEPH HEDARY" with the remark "*** *STOLEN* *** VERIFY TCIC BY VIN." The return itself instructed verification. By 3:58:25 p.m. the CAD identified the driver as Hedary, Antoine Joseph. The owner was the driver, and the officers' own screen had told them to verify before they ever drew a weapon.

28. At 4:28:22 p.m. — approximately thirty-eight minutes before the recorded time of arrest — the CAD generated an automatic entry on this incident: "[Camera Location] RTCC Camera D-282V is located near 100 E. Belknap St and may be in view of your call location. Contact RTCC for assistance." The City's computer-aided dispatch system is integrated with its Real Time Crime Center camera network and prompts officers to specific cameras by identifier.

**D. Custody first, confirmation second — and confirmation disproves the hit.**

29. Defendant Callender's report states: "Once the occupants were placed into custody, officers started to confirm the vehicle through PIC. But quickly discovered that the driver ARR (HEDARY, ANTOINE W/M 11/26/86) was the registered owner." Plaintiff and his passenger were seized and placed in custody before any officer verified the hit, and verification immediately disproved it. The Department's own summary narrative for the case records the

result in one sentence: "On 09/08/24 Officers located what they believed to be a stolen vehicle but made a Narc arrest."

30. At 3:54:47 p.m., the TCIC stolen-vehicle entry for plate PVJ2872 was cleared (Report 240063176, Supplement 003) — four minutes and eight seconds after the CAD recorded Plaintiff in custody. From that moment, no officer had reasonable suspicion or probable cause to believe the vehicle was stolen, and the sole stated justification for the stop had dissipated.

31. The stolen-vehicle status existed in the City's system only because Plaintiff asked the City to create it, and persisted only because the City never cleared it. The verification the officers performed after seizing Plaintiff at gunpoint was the verification the governing rules required them to perform first, and it would have ended the encounter before a weapon was drawn.

32. The Department's own record check on Plaintiff that afternoon returned a driver-license status bearing the value "END DT: 12319999" — a placeholder date of December 31, 9999, indicating that no end date had ever been entered in the field.

**E. The search after the justification dissipated.**

33. The officers did not release Plaintiff when the stolen-vehicle status was cleared. Per the report, "[b]efore releasing the vehicle," officers claim to have observed "in plain view a bulb-shaped glass pipe shoved into a drink container," and on that basis searched the entire vehicle. The Department's dispatch record fixes when that claim was first logged: at 4:34:31 p.m., unit A114 (Defendant Moore) entered "FIREARM POINTED, PLAIN VIEW OBSERVED GLASS PIPE PUSHED INTO ICE OF CUP IN FRONT PASSENGER DOOR" — thirty-nine minutes and forty-four seconds after the stolen-vehicle entry had been cleared, and forty-four minutes after Plaintiff had been placed in custody.

34. Report 240071260 exists in three narrative versions produced by the City in a single production, and the plain-view claim is not stated the same way across them. The arrest report supporting Plaintiff's own arrest (Booking A2411095, printed September 8, 2024 at 5:51:07

p.m.) states only that officers observed "a bulb-shaped glass pipe shoved into a drink container" — no location. The citation report for the passenger (Booking C2401665, printed September 8, 2024 at 6:58:29 p.m.) and the offense report (printed September 11, 2024 at 2:25:06 a.m.) add that the pipe was "in the passenger side door where ARR (ARAGON, ELISSA, MARIE W/F) was sitting." The sworn probable-cause affidavit on which Plaintiff was held omits the location entirely. The one document that was sworn, and the one document that supported Plaintiff's own arrest, are the two that do not say where the object was.

35. In the ensuing search, officers opened a closed, opaque "round circular car scent container" that "was on top of the front center dashboard in a sunken down pocket," and reported finding inside it a plastic bag of suspected methamphetamine. The contents of a closed opaque container are not in plain view.

36. No officer had a warrant. No officer had consent. No exigency existed: the vehicle was stopped, surrounded by at least seven police units, and its occupants were in custody.

**F. The arrest, the affidavit, and the contradiction on its face.**

37. The arrest report and the jail paperwork record Plaintiff's time of arrest as 5:06 p.m. (17:06), at 2980 8th Avenue. The same arrest report carries a "Reporting Date" of September 8, 2024 at 15:50:00 — 3:50 p.m., two minutes after the felony stop was announced, before the stolen-vehicle entry was cleared, and before any object was claimed to have been observed.

38. The narrative of Report 240071260 — repeated verbatim in Defendant Callender's sworn probable-cause affidavit — sequences the TruNarc testing of the suspected substance before the announcement of arrest: the substance was transported by Defendant Leary to the property room, "was later tested by TruNarc PCS #KSN216 Scan #35307 and tested presumptive positive for methamphetamine," and "[a]t this time the driver Antoine, was informed that he was under arrest." On information and belief, and as the Department's TruNarc and property-room records will evidence, scans 35307 and 35311 on device PCS #KSN216 were run at 5:22 p.m.

and 5:26 p.m. — sixteen and twenty minutes after the recorded arrest time. The narrative's own account confirms the second scan could not have preceded the arrest: it states that the second bag was found only "once arriving at the jail," after Plaintiff had been arrested and transported, yet reports a single combined weight for both bags, 2.22 grams. The narrative also records the second scan inconsistently, as "Scan #3511" in one place and 35311 in another.

39. Plaintiff was transported to the Fort Worth jail at 350 W. Belknap Street and booked, Booking A2411095, on a charge of possession of a controlled substance in Penalty Group 1, one gram or more but less than four grams, Tex. Health & Safety Code § 481.115(c), a third-degree felony.

40. On Defendant Callender's affidavit reciting the narrative described above, municipal magistrate Joseph Henderson signed a probable-cause determination and commitment order, and Plaintiff was held pursuant to that order.

41. On September 9, 2024 at 1:02 p.m., Supplement 001 to Report 240071260, authored by Officer Bennett (Badge 2805), recorded: "PCS filed/accepted on ARR Hedary (TSP 883374). GCC (PDP) issued to Aragon in the field." Plaintiff's passenger was cited for possession of drug paraphernalia, a Class C misdemeanor, and released at the scene.

42. Defendant Callender knew when he swore the affidavit that Plaintiff had been arrested before any TruNarc test was run, because he participated in the arrest and the report he authored records the arrest time. He knew that the plain-view claim rested on an object whose location his own reports describe inconsistently and his affidavit does not describe at all. He knew that Plaintiff had been taken into custody before the stolen-vehicle hit was confirmed, that confirmation had shown Plaintiff to be the owner and the theft complainant, and that the entry had been cleared more than an hour before the arrest. None of these facts appears in the affidavit.

**G. Booking records, identifiers, and the dismissal.**

43. The jail registration form generated for Plaintiff's booking recorded his county identification number as "0000" and his tracking number as "0000000000," and recorded no transporting officer ("N/A"). FWPD records of this arrest misspell his name "Antonie" and record as his residence an address that was not his residence — 2251 Hemphill Street, the address the same report lists for Plaintiff's father under "Nearest Relative."

44. The resulting prosecution, Cause No. 1840413 in the 371st Judicial District Court of Tarrant County, Texas, was dismissed on October 3, 2024; no conviction resulted from the charge. The Texas Department of Public Safety's certified criminal history record of Plaintiff, certified September 3, 2026, records the court disposition of that charge as "DISMISSED" on that date and records no prosecution action; the disposition is coded DM14 in county records.

**H. The recordings, and the units missing from them.**

45. The body-worn camera activation roster in Report 240071260 lists an Axon activation status for every responding unit except one. It records that Defendant Hooks's fleet unit camera, Axon 2170909, was "not activated," and the CAD carries the same entry for unit A215 at 4:33:21 p.m. A CAD note at 5:08:20 p.m. records "UNIT# 218-0278 DASH CAM OFF" for unit B214 (Defendant Witt). The offense report's own dashboard-camera field nonetheless claims: "1ST OFFICER VEHICLE DASHBOARD CAMERA CAPTURED/TO DISC."

46. Defendant Ford, unit A216, was on scene at 3:48:44 p.m., took Plaintiff and his passenger into custody, and later recovered the vehicle — and appears nowhere in that activation roster. The City has never produced a body-worn or in-car recording for unit A216, and has never certified that none exists.

47. The City produced the offense reports, the arrest report, the probable-cause affidavit, and the jail paperwork for this incident under Public Information Act request E005694-062426, determined "no responsive records" for six categories keyed to a date on which nothing occurred, and by letter of July 9, 2026 closed the body-worn camera portion of that request for claimed

want of the information required by Tex. Code Crim. Proc. art. 2B.0112. Plaintiff served the City with a written preservation and litigation-hold demand on July 13, 2026. The native CAD exports, the Real Time Crime Center origination records, the TruNarc device logs, the TCIC/NCIC entry-and-clearance audit records, and the radio traffic remain unproduced.

**I. Ten days earlier: Plaintiff's open recording of a police operation across the street.**

48. On August 28 and 29, 2024, FWPD officers, including tactical personnel, forcibly entered a residence in the 3000 block of 8th Avenue, directly across the street from Plaintiff's home. Plaintiff asserts no privacy interest in that residence

49. Plaintiff stood at his own home and openly recorded that operation on both days. Officers saw Plaintiff recording and acknowledged that he was recording them. The right to record police officers performing their duties in public was clearly established in this circuit at that time. *Turner v. Driver*, 848 F.3d 678, 688–90 (5th Cir. 2017).

50. Ten to eleven days later, Plaintiff was seized at gunpoint in a felony stop that originated not from any citizen call but from the Department's Real Time Crime Center, on an incident with no caller, at a location one block from the home where he had recorded the officers, where four Department units were already positioned before the incident existed, on a stolen-vehicle status the Department itself had created at Plaintiff's request and never cleared.

**J. The City's records-integrity and Real Time Crime Center practices.**

51. The City's own signed submission to the Texas Attorney General in Public Information Act matter E005444, dated July 15, 2026, admits that the City's intelligence exchange, INTEX, including a Homeland Security Unit, generates "case specific reports, investigations, and potential targets for threat assessments."

52. The City's produced CAD records document, as to Plaintiff, a repeating signature: an incident created and, within one second, an "Incident Transfer" entry bearing the fusion identifier "C2C1" — on September 8, 2024 (3:42:45 p.m.); on February 11, 2025 (10:22:29 a.m., CAD 250136976); and on April 11, 2026 (3:21:45 p.m., CAD 260378008). On information and belief, "C2C1" is an automated routing rule on the City's CentralSquare computer-aided dispatch system that transmits incident data to or from a system the City has declined to identify. The City has never produced the configuration of that rule or the transfer logs, though both have been specifically requested.

53. The City's produced records further document, as to Plaintiff: the Real Time Crime Center running a full NCIC return, an automated license-plate-reader history, and "caution advisory bolo's" on him while he stood at his own theft report on August 11, 2024; a Real Time Crime Center notification, of unproduced origin, precipitating the armed encounter of September 8, 2024; NCIC and TCIC returns generated by the Department in July and August 2024 bearing a date of birth Plaintiff does not have, 11/26/1988, against or alongside his correct date of birth, 11/26/1986, together with a county identification number carried in the same return with its digits transposed (Report 240055248, July 15, 2024 return; CAD 240775714, TCIC return of August 11, 2024); and the placeholder value "12319999" on the September 8, 2024 driver-license return. The July 15, 2024 encounter is the subject of Civil Action No. 4:26-cv-00943-P-BJ in this Court and no claim arising from it is asserted here.

54. The stolen-vehicle status on which the September 8, 2024 stop rested is itself the product of a records practice: the Department entered a felony stolen status at a complainant's request, left every clearance and recovery field of its own report blank, made no inquiry when the vehicle returned to its owner, and left the status active until officers acting on it had already seized the owner at gunpoint. Report 240063176 is the Department's standard offense report form; the blank clearance fields are the form's own fields, unfilled.

55. The City has no policy, or no enforced policy, requiring that a stolen-vehicle or wanted-person hit be confirmed with the entering agency before officers deploy a felony stop on it — even where, as here, the entering agency is the Department itself and confirmation is a records query away, and even where, as here, the return on the officers' own screen instructs "VERIFY TCIC BY VIN." The City trains its officers to saturate an area and execute a high-risk stop on a Real Time Crime Center notification, and does not train them that the notification is not itself probable cause and must be confirmed before force is used.

56. The City's handling of the records of this incident follows a documented pattern in Plaintiff's dealings with the City: "no responsive records" answers keyed to dates on which nothing occurred; recordings withheld on procedural grounds after the statutory elements had been supplied; activation rosters that omit units known from the City's own CAD to have been present; and native files, hashes, and audit trails withheld while derivative copies are produced. Plaintiff pleads this Part on the City's own documents. Additional records — the RTCC origination and tasking records for September 8, 2024, the C2C1 rule configuration and transfer logs, the TCIC/NCIC audit trail for the August 12, 2024 entry, the TruNarc device logs, and the Axon audit trails — exist, have been specifically requested, and remain withheld. Allegations in this Part, and the TruNarc scan times above, stated on information and belief are those that the withheld records will evidence, and are so identified under Fed. R. Civ. P. 11(b)(3).

**K. The origination of the September 8, 2024 encounter, and the record that does not exist.**

57. The Department's own account of why the September 8, 2024 encounter happened begins with a notification, not with an observation. Defendant Callender's report states that "Officers were notified by Crime Center that there was an occupied Stolen Vehicle With the Tx LP (PVJ2872) driving Southbound on 8th Ave." The City has never produced any record of that notification: not the detection that generated it, not its timestamp, not the verbatim text transmitted to field units, not the identity of the operator who sent it, and not the query or tasking

that preceded it. Every one of those records has been specifically identified and requested, and none has been produced.

58. What the City did produce documents an incident that does not behave like a dispatched call. CAD incident 240876561 was created at 3:42:44 p.m. with no caller — the Call Receipt block is blank — and with a problem nature of "Investigation," not "Stolen Vehicle." One second later, at 3:42:45 p.m., the activity log recorded: "Incident has been transferred, fusion ID C2C1." Unit A114 was recorded assigned, en route, and arrived in that same second, and on scene the next. Units B222, A212, and A216 were each logged "Responding From = 8TH\8TH AVE" — already on the street where the stop would occur. The felony stop was not announced until 3:48:33 p.m., five minutes and forty-eight seconds after the first unit was on scene. An incident with no caller does not create itself, and a unit does not arrive at a scene in the same second the scene is created.

59. The one-second transfer entry is not unique to that day. The City's produced dispatch records carry the same entry at the creation of two later incidents involving Plaintiff: on February 11, 2025 at 10:22:29 a.m. (CAD 250136976) and on April 11, 2026 at 3:21:45 p.m. (CAD 260378008). Three encounters with the same man across nineteen months, each bearing at the second of its creation a transfer of the incident to a system the City has declined to name.

60. On November 5, 2025, FWPD officers stopped Plaintiff at 3:32:02 a.m. and, after the supervision status on which they had initially relied failed confirmation, continued to hold him a further fourteen minutes and twenty-three seconds, until a canine unit was assigned at 3:46:25 a.m. (Report 250083610; CAD 251114166). Plaintiff asserts no claim in this action arising from that stop: the officers' initial reliance on the county record is not challenged here, and the post-confirmation prolongation is the subject of separate proceedings. It is pleaded here for one purpose. The record of that encounter, like the records of September 8, 2024, February 11, 2025, and April 11, 2026, recites a justification that the City's own systems had already disproved, and the record of what actually placed officers in position is again the record that does not exist.

61. On June 25, 2026, Plaintiff was stopped by deputies of the Tarrant County Sheriff's Office. That encounter is the subject of separate future proceedings against Tarrant County, and no claim arising from it is asserted here. Plaintiff does not offer it as evidence of any custom or policy of the City, and does not ask this Court to attribute the conduct of a county deputy to the City. It is pleaded solely as context: across agencies and across two years, Plaintiff has been the subject of repeated law-enforcement encounters in which the record of what originated the encounter is the single record that is never produced.

62. Plaintiff alleges, on information and belief and under Fed. R. Civ. P. 11(b)(3), that the stale stolen-vehicle status recited in the Department's reports was not the operative cause of the officers' presence and conduct on September 8, 2024, but a justification recorded after Plaintiff had already been seized. The bases for that allegation are the City's own produced records and the City's own silence: an incident created with no caller and a problem nature of "Investigation" rather than "Stolen Vehicle"; a transfer of that incident to an unnamed system one second after its creation; four units positioned on 8th Avenue before the incident existed; the announcement of a felony stop nearly six minutes after the first unit was already on scene; and the City's failure, across more than two years of requests, to produce any record whatever of the notification its own officer's report says he received. The records that will establish or refute this allegation — the Real Time Crime Center operator, console, query, and tasking logs for August 11 through September 8, 2024; the CAD transaction and audit logs for incident 240876561 showing every field change with its prior value, operator, and workstation; and the configuration of and transfer logs for the C2C1 rule — are in the City's exclusive control, have been specifically requested, and are withheld.

63. Plaintiff pleads no claim in this action that any communication of his was intercepted, and asserts no cause of action under 18 U.S.C. § 2520, 18 U.S.C. § 2707, or Tex. Civ. Prac. & Rem. Code ch. 123. He pleads what the City's produced records show, and what the City's withheld records will show, about the origin of the encounter of September 8, 2024. He seeks no

injunctive or declaratory relief directed at surveillance and no damages for being observed; the injuries he pleads are the completed seizure, search, arrest, and detention of September 8, 2024. Plaintiff reserves all rights as to any claim that the production of the withheld records may support.

## V. IDENTIFICATION OF THE DOE DEFENDANTS

64. The identities of John Does 1 and 2 are recorded in: (a) the Real Time Crime Center operator, console, and tasking logs for the September 8, 2024 "Crime Center" stolen-vehicle notification; (b) the CAD activity, edit, and transaction logs for incident 240876561, including the operator and workstation identifiers on each entry; and (c) the RTCC query and notification records for plate PVJ2872 between August 11 and September 8, 2024. Each is a small, specifically identified record set in the City's exclusive control and subject to retention schedules.

65. Those are also the records that will establish or refute the allegation in Part IV.K concerning the origin of the encounter. Plaintiff's need for them is twofold — to name the Doe Defendants before the period of Fed. R. Civ. P. 4(m) expires, and to determine whether the justification recorded in the Department's report is the justification on which its officers acted. Plaintiff has sought these records from the City under the Texas Public Information Act since 2024 without obtaining them; several of the classes he seeks, including computer-aided dispatch transaction logs and Real Time Crime Center query and tasking logs, are subject to short retention cycles and are at risk of loss with the passage of time.

66. Concurrently with the issuance of summons, Plaintiff will move under Fed. R. Civ. P. 26(d)(1) for leave to take limited expedited discovery — a single Rule 34 request to the City confined to the records identified in this Part — for good cause, the requested discovery being directed solely to the City, which asserts no immunity from suit, and confined to records in its exclusive control. Plaintiff will amend to name the Doe Defendants promptly upon identification.

Plaintiff acknowledges that the substitution of a named defendant for a Doe does not relate back under Rule 15(c). *Jacobsen v. Osborne*, 133 F.3d 315, 320–21 (5th Cir. 1998).

## VI. TIMELINESS

67. This Complaint was delivered to the Clerk of this Court on September 8, 2026, through the Court's emergency filing procedure, and is filed as of that date. Fed. R. Civ. P. 5(d)(2)(A). A signed paper original, with the filing fee, is tendered at the Fort Worth divisional clerk's office on the next business day.

68. Counts I, II, and IV accrued on September 8, 2024, and this action is filed within two years of that date. Count III is pleaded on two theories: arrest without probable cause, which accrued on September 8, 2024, *Wallace v. Kato*, 549 U.S. 384, 388–90 (2007); and detention pursuant to legal process procured by a materially false affidavit, which accrued no earlier than the dismissal of the prosecution on October 3, 2024. *McDonough v. Smith*, 588 U.S. 109, 116–20 (2019); *Thompson v. Clark*, 596 U.S. 36, 44–49 (2022). Each is timely.

## VII. CAUSES OF ACTION

### COUNT I — 42 U.S.C. § 1983 — Fourth Amendment — Unreasonable Seizure of Plaintiff's Person (the September 8, 2024 felony stop) — Against Callender, Moore, Muse, Witt, Hooks, Cartwright, Leary, Ford, and John Does 1 and 2

69. Plaintiff incorporates the foregoing paragraphs.

70. The seizure of Plaintiff on September 8, 2024 was a seizure of his person within the meaning of the Fourth Amendment. A felony stop conducted with drawn and pointed weapons, followed by custody, is a seizure that requires, at minimum, reasonable suspicion at its inception and probable cause for the custody that followed. *Terry v. Ohio*, 392 U.S. 1, 19–21 (1968); *United States v. Sharpe*, 470 U.S. 675, 682–83 (1985).

71. An officer may act on a notification from another officer or unit only if the source of the notification possessed the facts that justify the seizure; if the source did not, the seizure is

unlawful notwithstanding the acting officer's reliance. *United States v. Hensley*, 469 U.S. 221, 232–33 (1985); *Whiteley v. Warden*, 401 U.S. 560, 568–69 (1971). The "Crime Center" notification on which the Defendant officers acted rested on a stolen-vehicle status that the Department itself had created at Plaintiff's request and had never verified, updated, or cleared, and that the Department's own records showed belonged to a vehicle owned by the complainant. The Department possessed no reasonable suspicion that the vehicle was stolen. It possessed, in its own file, the fact that it was not.

72. The Defendant officers seized Plaintiff and placed him in custody before any of them confirmed the hit. The operating rules of the system on which they relied require confirmation with the entering agency before an arrest is made on a hit, and treat a hit alone as insufficient for arrest. The entering agency was their own Department. The return on their own screen instructed "VERIFY TCIC BY VIN." The Defendant officers' failure to perform, before deploying a felony stop, a confirmation that was required, that was immediately available, that their own system directed, and that would have shown the person they were seizing to be the owner and the complainant, rendered the seizure objectively unreasonable.

73. John Does 1 and 2 originated the encounter by generating and transmitting to field units a notification that an occupied stolen vehicle was traveling on 8th Avenue, without validating the underlying status against the Department's own theft report, without confirming the entry with the Department's records desk, and, on information and belief, on the basis of a detection or alert that they knew or should have known had never been reconciled against recovery. Fed. R. Civ. P. 11(b)(3).

74. Plaintiff suffered injury: he was held at gunpoint, taken into custody, and deprived of his liberty on a basis that did not exist. He seeks compensatory damages, nominal damages, and punitive damages against the individual Defendants.

**COUNT II — 42 U.S.C. § 1983 — Fourth Amendment — Unlawful Prolongation of the Seizure and Warrantless Search of the Vehicle — Against Callender, Moore, and Leary as**

**to the Search, and Against Callender, Moore, Muse, Witt, Hooks, Cartwright, Leary, and Ford as to the Continued Detention**

75. Plaintiff incorporates the foregoing paragraphs.

76. A seizure that is lawful at its inception becomes unlawful when it is prolonged beyond the time reasonably required to complete its mission, absent independent reasonable suspicion. *Rodriguez v. United States*, 575 U.S. 348, 354–57 (2015); *Florida v. Royer*, 460 U.S. 491, 500 (1983); *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc); *United States v. Dortch*, 199 F.3d 193, 198–200 (5th Cir. 1999). When the officers "quickly discovered" that Plaintiff was the registered owner, and when the stolen-vehicle status was cleared at 3:54:47 p.m., the mission of the stop was complete. Nothing remained to investigate. The Defendants had no independent, articulable basis to detain Plaintiff further, and their continued detention of him from that moment forward was a seizure without justification. Every Defendant officer named in this Count remained on scene throughout that continued detention, none released Plaintiff, and each had a realistic opportunity to do so; those who did not personally conduct the search are liable for the continued detention in which they participated and, in the alternative, for their failure to intervene in it. *Whitley v. Hanna*, 726 F.3d 631, 646–47 (5th Cir. 2013); *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).

77. The search of the vehicle was warrantless and is presumptively unreasonable. The only justification the Defendants have offered is plain view. The plain-view doctrine requires that the officer be lawfully in the position from which the object is seen and that the object's incriminating character be immediately apparent. *Horton v. California*, 496 U.S. 128, 136–37 (1990). Neither requirement was met. The officers' vantage point was the product of a detention that had already exceeded its lawful scope — the plain-view claim was not even logged until 4:34:31 p.m., forty minutes after the stolen-vehicle entry was cleared. And an object whose location the officers state in some of their own accounts, omit from the account supporting Plaintiff's arrest, and omit from the account that was sworn, was not an object whose presence and character were immediately apparent. Defendant Callender authored every version of that

claim; Defendant Moore logged the observation and the pointed firearm together in the CAD; Defendant Leary took custody of what the search produced.

78. Even had the pipe been lawfully observed, plain view does not extend to the interior of a closed, opaque container. Opening the scent container on the dashboard was a distinct search requiring its own justification. *Arizona v. Hicks*, 480 U.S. 321, 324–25 (1987). The automobile exception permits the search of a container within a vehicle only where there is probable cause to believe the object of the search is inside that container. *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Ross*, 456 U.S. 798, 824–25 (1982). No fact known to the officers supplied probable cause as to the interior of a closed air-freshener container.

79. Plaintiff seeks compensatory damages for the unlawful detention and the search, nominal damages, and punitive damages against the individual Defendants.

**COUNT III — 42 U.S.C. § 1983 — Fourth Amendment — Arrest Without Probable Cause and Detention Pursuant to Legal Process Procured by a Materially False Affidavit — Against Callender**

80. Plaintiff incorporates the foregoing paragraphs.

81. Plaintiff does not plead this Count on the theory that the arrest was the fruit of the unlawful search alleged in Count II, and acknowledges that the exclusionary rule does not supply a rule of decision in an action for damages under § 1983. This Count rests on the affidavit itself and on the sequence of events it misstates and the facts it omits.

82. The Fourth Amendment governs a person's detention pursuant to legal process — here, the probable-cause determination and commitment order of September 8, 2024 — and is violated where that process is procured by an officer's affidavit that includes statements the officer knew to be false or made with reckless disregard for their truth, or that omits facts the officer knew, where the false statements and omissions were material to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155–56, 171–72 (1978); *Manuel v. City of Joliet*, 580 U.S. 357, 367–69 (2017); *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018); *Melton v.*

*Phillips*, 875 F.3d 256, 264 (5th Cir. 2017) (en banc); *Hart v. O'Brien*, 127 F.3d 424, 448–49 (5th Cir. 1997).

83. Defendant Callender's affidavit presented to the magistrate a sequence in which the suspected substance was tested and found positive before Plaintiff was arrested. That sequence did not occur. Plaintiff was arrested at 5:06 p.m.; the tests the affidavit describes were run afterward. Defendant Callender participated in the arrest and authored the report that records its time; he knew the sequence was false when he swore to it. The affidavit further omitted that the plain-view observation on which the search rested was an object whose location the officers had recorded inconsistently and had not logged until forty minutes after the stop's justification ended; that Plaintiff had been placed in custody on a stolen-vehicle status that the Department's own records disproved; that the officers' own return had instructed verification; and that the entry had been cleared more than an hour before the arrest. Each omitted fact was known to the affiant, and each was material.

84. The magistrate's signature does not break the chain of causation between Defendant Callender's conduct and Plaintiff's detention. In this circuit an independent intermediary's decision insulates the initiating officer "only where all the facts are presented to the grand jury, or other independent intermediary[,] where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information from the independent intermediary." *Winfrey v. Rogers*, 901 F.3d 483, 496–97 (5th Cir. 2018) (quoting *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988)). All the facts were not presented. The magistrate was not told that Plaintiff was the reported victim and the registered owner of the vehicle; that the stolen-vehicle entry had been cleared one hour and eleven minutes before the arrest; that the officers' own return had instructed "VERIFY TCIC BY VIN" and that no officer acted on it before force was used; that the plain-view claim was not logged until forty minutes after the entry was cleared and is stated inconsistently across the Department's own versions of the same report; or that the encounter originated in a "Crime Center" notification of which the Department has produced no record. On

the corrected-affidavit analysis this circuit requires — the affidavit reformed to excise the false sequence and to include the omitted facts — no probable cause remains. *Winfrey*, 901 F.3d at 494–95.

85. At 5:06 p.m., when Defendant Callender arrested Plaintiff, no TruNarc test had been performed, the stolen-vehicle basis had been cleared one hour and eleven minutes earlier, and the only claimed observation was a glass pipe whose location the officers could not consistently describe. Independently of the affidavit, the warrantless arrest of Plaintiff at 5:06 p.m. lacked probable cause at the moment it was made, and Plaintiff pleads that arrest as a completed Fourth Amendment violation in its own right, for which the seizure itself is the injury. *Wallace v. Kato*, 549 U.S. 384, 388–90 (2007).

86. The prosecution of Cause No. 1840413 was dismissed on October 3, 2024, and no conviction resulted from it. Plaintiff pleads that the prosecution terminated in his favor within the meaning of *Thompson v. Clark*, 596 U.S. 36, 49 (2022), and pleads, independently and in the alternative, the arrest-without-probable-cause claim stated above, which does not depend on the termination of the prosecution.

87. Plaintiff seeks compensatory damages for his arrest and detention, nominal damages, and punitive damages against Defendant Callender.

**COUNT IV — 42 U.S.C. § 1983 — First Amendment — Retaliation — Against the City and John Does 1 and 2**

88. Plaintiff incorporates the foregoing paragraphs.

89. Plaintiff engaged in activity protected by the First Amendment when, on August 28 and 29, 2024, he openly recorded FWPD officers conducting a tactical operation in public view across the street from his home, and when he did so in the officers' sight and with their acknowledgment. *Turner v. Driver*, 848 F.3d 678, 688–90 (5th Cir. 2017).

90. Ten to eleven days later, Plaintiff was subjected to an adverse action that would chill a person of ordinary firmness from continuing to engage in that activity: an armed felony stop, custody, search, arrest, and prosecution. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

91. That adverse action was not supported by probable cause at its inception, for the reasons stated in Count I. Where the plaintiff establishes the absence of probable cause, the retaliation claim proceeds under the ordinary causation framework, and the plaintiff must show that retaliation was a substantial or motivating factor behind the action. *Nieves v. Bartlett*, 587 U.S. 391, 401–04 (2019); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977).

92. Independently, objective evidence of the kind recognized in *Gonzalez v. Trevino*, 602 U.S. 653, 658–60 (2024), supports an inference of retaliatory causation, each item drawn from the City's own produced records: the stop was originated by the Real Time Crime Center rather than by any citizen complaint; the incident was created with no caller and with a problem nature of "Investigation" rather than "Stolen Vehicle"; the incident was transferred to an unnamed system one second after its creation, an entry that recurs at the creation of two later incidents involving Plaintiff on February 11, 2025 and April 11, 2026; four Department units were positioned on 8th Avenue before the incident existed and nearly six minutes before a felony stop was announced; the stop occurred one block from the home where Plaintiff had recorded the officers; the stolen-vehicle status on which the stop rested had been left uncleared for four weeks and was the subject of a Real Time Crime Center return, license-plate-reader history, and "caution advisory" notes on Plaintiff while he was reporting the theft; the City has produced no record of the "Crime Center" notification that its own officer's report identifies as the reason those officers were there; and no comparable felony stop is known to have been executed on any other complainant's own reported-stolen vehicle in the Department's records.

93. Plaintiff pleads on information and belief, under Fed. R. Civ. P. 11(b)(3), that John Does 1 and 2 originated the September 8, 2024 notification with knowledge of Plaintiff's

recording activity and in response to it. The records that will evidence this allegation — the RTCC operator, query, and tasking logs for August 11 through September 8, 2024 — have been specifically requested and are withheld.

94. Plaintiff seeks compensatory damages, nominal damages, and punitive damages against the individual Defendants.

**COUNT V — 42 U.S.C. § 1983 — Municipal Liability — Against the City of Fort Worth**

95. Plaintiff incorporates the foregoing paragraphs and Counts I through IV.

96. A municipality is liable under § 1983 where an official policy or a persistent, widespread custom, attributable to its policymaker, is the moving force behind a constitutional violation. *Monell v. Department of Social Services*, 436 U.S. 658, 690–94 (1978); *Piotrowski v. City of Houston*, 237 F.3d 567, 578–80 (5th Cir. 2001); *Peterson v. City of Fort Worth*, 588 F.3d 838, 847–52 (5th Cir. 2009). At the pleading stage a plaintiff "need only allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable," and the description of the policy and its relationship to the violation must contain specific facts. *Groden v. City of Dallas*, 826 F.3d 280, 284–85 (5th Cir. 2016). The policymaker for the practices alleged here is the City's Chief of Police, to whom the City has delegated final authority over the Department's records, dispatch, Real Time Crime Center, and field-operations practices, and, in the alternative, the City Council and City Manager. A municipality has no immunity, qualified or otherwise. *Owen v. City of Independence*, 445 U.S. 622, 638 (1980).

97. The City is liable on four independent grounds.

98. First, a custom of records-integrity failure. The City enters felony stolen-vehicle statuses at complainants' requests, leaves the clearance and recovery fields of its own reports blank, makes no inquiry when vehicles return to their owners, and leaves entries active for its officers to act upon with force. The blank fields of Report 240063176, the twenty-seven-day

persistence of the entry through September 8, 2024, the placeholder values on the City's returns, and the nonexistent date of birth and transposed identification number carried on the City's own returns concerning Plaintiff are the City's own documents. Systemic or reckless recordkeeping of this kind, on which officers act, is what the Supreme Court has distinguished from isolated clerical error. *Herring v. United States*, 555 U.S. 135, 146–47 (2009); *Arizona v. Evans*, 514 U.S. 1, 14–15 (1995). That custom was the moving force behind the seizure of Plaintiff: the felony stop rested on nothing but the uncleared entry.

99. Second, a single, identifiable practice, pleaded as one unconstitutional practice and not as a numerical pattern of prior incidents. The City originates armed field encounters through Real Time Crime Center notifications that are not validated against the Department's own records before transmission; it creates or preserves no record of what originated them that it is willing or able to produce; and the justification that appears in the resulting offense report is therefore a justification assembled after the seizure rather than the basis on which the officers acted. Where a plaintiff pleads that a single official practice was itself unconstitutional and was the moving force behind his injury, he need not plead the numerosity that a pattern theory requires. *Monell*, 436 U.S. at 690–91, 694; *cf. Peterson*, 588 F.3d at 851 (stating the numerosity requirement for pattern proof). The City's own documents evidence the practice: its signed submission admitting that INTEX generates "case specific reports, investigations, and potential targets for threat assessments"; the one-second C2C1 transfer entry recurring at the creation of three incidents involving Plaintiff; the Real Time Crime Center's full NCIC return, license-plate-reader history, and "caution advisory bolo's" run on Plaintiff while he stood at his own theft report; the "Crime Center" notification recited in Defendant Callender's report as the reason officers saturated 8th Avenue; and the absence, across more than two years of specific requests, of any produced record of that notification. The origination records are withheld and are identified under Fed. R. Civ. P. 11(b)(3).

100. Third, a failure to train. The City does not train its officers that a stolen-vehicle hit or a Real Time Crime Center notification is not itself probable cause and must be confirmed with the entering agency before a felony stop is executed on it, notwithstanding that the need for such training is obvious, that the operating rules of the systems its officers use so require, that the returns on its officers' own screens instruct verification, and that the consequence of acting without confirmation — a felony stop at gunpoint of an innocent person — is a highly predictable constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 388–90 (1989); *Board of County Commissioners v. Brown*, 520 U.S. 397, 407–10 (1997). Nor does the City train its officers that the mission of a stolen-vehicle stop ends when the status is cleared, or that plain view does not reach the interior of a closed container. The conduct of eight officers on September 8, 2024 — none of whom confirmed the hit before force was used, none of whom acted on the "VERIFY TCIC BY VIN" instruction on their own screen, and none of whom released Plaintiff when the entry was cleared — reflects the absence of that training rather than the deviation of one officer from it.

101. Fourth, the City's handling of the records of this incident — an activation roster that omits a responding unit, a dashboard-camera field that contradicts the CAD, "no responsive records" determinations keyed to a date on which nothing occurred, and the withholding of native files and audit trails while derivative copies are produced — is pleaded as evidence of the City's knowledge of the customs above and its acquiescence in them.

102. Plaintiff seeks compensatory damages against the City. Plaintiff does not seek punitive damages against the City. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

## VIII. PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in his favor and award:

(a) compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;

(b) nominal damages;

(c) punitive damages against each individual Defendant, *Smith v. Wade*, 461 U.S. 30, 56 (1983), and none against the City;

(d) an order directing the City to correct, in every FWPD-controlled record system, the identifiers concerning Plaintiff generated by or carried in the records of this incident — the county identification number recorded as "0000," the tracking number recorded as "0000000000," the date of birth recorded as 11/26/1988, the transposed county identification number, the misspelling of his name, and the address recorded as his residence — and to preserve and produce the audit trail of each correction;

(e) costs under 28 U.S.C. § 1920 and, should counsel appear, reasonable attorney's fees under 42 U.S.C. § 1988;

(f) pre- and post-judgment interest as allowed by law; and

(g) all other relief to which Plaintiff is justly entitled.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable. Fed. R. Civ. P. 38(b).

Respectfully submitted,

09-08-26

Antoine Joseph Hedary
Plaintiff, pro se
1821 NW 20th Street
Fort Worth, Texas 76164
682-208-2234
ajhedary@icloud.com

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Antoine Joseph Hedary

**(b)** County of Residence of First Listed Plaintiff TARRANT
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Pro se- ANTOINE JOSEPH HEDARY, 1821 NW 20th Street, Fort Worth, TX

**DEFENDANTS**

CITY OF FORT WORTH,TEXAS W,CALLENDER; C. MOORE M. MUSE; A.S. WITT; T.M. HOOKS; M.D. CARTWRIGHT; C.R. LEARY; J.E. FORD; JOHN DOE 1-2

County of Residence of First Listed Defendant TARRANT
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

SEP 09 2026 4:15 RECEIVED-USDC-NDTX-FW

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [X] 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Fourth amendment unreasonable seizure, unlawful prolongation and search, and arrest without probable cause
First amendment retaliation; municipal liability— arising from September 8, 2024 felony stop
42 U.S.C. 1983

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ To be determined at Trial

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):*

JUDGE Mark T. Pittman DOCKET NUMBER 4:26-CV-00943-P-BJ

DATE 09-08-26

SIGNATURE OF ATTORNEY OF RECORD
Antoine Joseph Hedary, Pro Se 9-8-26

FOR OFFICE USE ONLY

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______